IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO.:  1:08cr26-SPM

GARTH EDWARD HAMBELTON,

     Defendant.
_____/

## ORDER GRANTING MOTION TO SUPPRESS

This cause came before the court on Defendant's Motion to Suppress Evidence and Incorporated Memorandum of Law.  Doc. 24.  Defendant argues that all evidence obtained on June 24, 2008, must be suppressed because law enforcement officers needed a warrant to cross over his locked gate to knock on his front door and because any consent to search that Defendant gave was tainted by the illegal entry onto his property or was invalid because his consent was involuntary.

The Government filed a written response.  Doc. 28.  At a hearing on January 7, 2009, the parties presented testimony and other evidence concerning the features of Defendant's property, the entry by law enforcement, and Defendant's consent to search.  The parties presented oral argument on February 13, 2009.

## BACKGROUND

On June 24, 2008, at approximately 11:00 a.m., agents of the Drug Enforcement Administration knocked on the front door of Defendant's house to talk to him about a suspected marijuana grow operation on his property. Defendant lives on a twenty-six acre parcel zoned residential and agricultural in Newberry, Florida.  The property is fenced completely around with what appears to be a four foot high wire field fence.  It is cross-fenced into various sections within.  The property contains a house, garage, pool, several outbuildings, and a pond.  The residential portion of Defendant's property where the house, garage, and pool are located is within a three to four acre area at the north west corner of the property.  It is enclosed on the front and one side by the perimeter fence and is enclosed from the rest of the property by an interior fence.  On the rest of the property, Defendant conducts various agricultural activities that at times have included raising quail, pheasant, peacocks, and prawns, and growing cantaloupe, watermelon, and marijuana.

A driveway approximately 100 to 125 feet long runs from the paved public road to the house.  The area between the house and the road is heavy with natural vegetation.  A chainlink gate, approximately five to six feet high, crosses the entrance to the driveway and is anchored to either side of the driveway with concrete block columns, which are approximately four feet high.  The gate is always closed and locked with two padlocks.  Attached to the gate are two

warning signs for "guard dogs" and a sign for Defendant's quail and pheasant business, "Call of the Wild."  To the side of the gate, Defendant has a larger sign for "Call of the Wild" with a phone number.

Defendant moved from Miami to Newberry approximately twenty years ago to enjoy the privacy of a rural area.  Defendant lives on the property with his son Daryl, who is twenty-one years old and autistic.  Daryl cannot be left alone except for short periods of time (one hour).  Daryl cannot read or write, and he has a tendency to wander off.  He has difficulty with disruptions to his routine.  Having the property fenced and locked helps to contain Daryl and keeps out unannounced visitors, who are likely to upset Daryl.  Defendant keeps his mailbox across the street, preventing the need for the letter carrier to enter his property.

The gate was locked when Agent Wayne Andrews of the Drug Enforcement Administration arrived at Defendant's house to conduct a "knock and talk."  Agent Andrews had information that Defendant could be growing marijuana on his property.  According to Agent Andrews, the information was just short of probable cause, so he developed a plan to talk with Defendant to elicit his cooperation.  Agent Andrews and task force officers Devinny, Merritt, and Wolfe climbed over the fence and walked up the driveway to Defendant's house.  Two other officers stayed by the gate.  No one tried to call Defendant at the phone number posted on the "Call of the Wild" sign.  Agent Andrews testified that

cellular telephone reception in the area is weak. In any event, he preferred a face to face encounter.

Officers Wolfe and Devinny stationed themselves at the sides of the house. Officer Merritt went with Agent Andrews to knock on the front door. When Defendant opened the door, he came outside and closed the door behind him. Agent Andrews told Defendant about the information he had and that he had noticed a strong odor of marijuana on the property. Defendant admitted that the marijuana odor was strong, that he had been caught, and that he might as well cooperate. Defendant was not restrained or handcuffed.

At the hearing, Defendant testified that he was surprised and felt invaded when he heard the knock on the door. He stopped Daryl from going to the door and saw six[1] men outside dressed in clothing that showed they were with the Drug Enforcement Administration. Defendant saw they had guns holstered at the

---

[1] Some testimony at the hearing concerned whether Defendant could see all six officers. The two officers who remained by the gate may have been in Defendant's line of sight. Officers Wolfe and Devinny were at the side of the house, however. The front facade of the house curves inward in a way that would place Officers Wolfe and Devinny outside Defendant's line of sight if they remained at their positions. But it is possible that Officers Wolfe and Devinny moved from their positions while Defendant was giving his consent to search. For purposes of this order, the Court will assume that Defendant saw all six officers at the time he was giving his consent to search. The issue is not material, however, to the curtilage or consent issues.

CASE NO.: 1:08cr26-SPM

hip.  Defendant was on work release[2], had been growing marijuana, and the odor of marijuana was noticeable to Agent Andrews at his door.  Defendant recalls Agent Andrews telling him that the search could be done "the easy way or the hard way."  Defendant's understanding of the hard way was that his door would be knocked down and that he and Daryl would be handcuffed.  Defendant acknowledged, however, that no explicit threat was made.  According to Defendant, Agent Andrews never advised him that a search warrant would be sought if Defendant did not consent.  Approximately two minutes into his conversation with Agent Andrews, Defendant gave written consent for the agents to search.  He showed the officers twenty-three marijuana plants that he was growing in a locked barn on the property.  In other sections of the barn, he showed the officers remnants of previous growing activities.  He also showed the officers processed marijuana, two rifles, and cash that he kept in the house.

## DISCUSSION

### A.     Curtilage

With limited exception, the Fourth Amendment requires a warrant before the Government can conduct a search of "persons, houses, papers, and effects." U.S. Const. amend. IV; Oliver v. United States, 466 U.S. 170, 176 (1984).  While

---

[2] Defendant was on work release on unrelated charges and was required to return to jail at night.  His ex-wife stayed at the house at night to look after Daryl.

CASE NO.: 1:08cr26-SPM

a person's house lies squarely within the protection of the Fourth Amendment, the surrounding land might not. Id.  The expectation of privacy that society is prepared to recognize extends from the home only to land that is within the curtilage area.  Id.   Activities conducted beyond its borders are not within the expectation of privacy that attaches to the home.  Id. at 180.

Curtilage is the area around the home that "harbors those intimate activities associated with domestic life and the privacies of home."  United States v. Dunn, 480 U.S. 294, 300 (1987).  This is in contrast to "open fields," which include all undeveloped or unoccupied areas outside of the curtilage even if those areas are neither open nor fields as those terms are commonly understood.  Id. at 304.  Heavily wooded areas can qualify as open fields.  Id. Open fields are regarded for Fourth Amendment purposes as tantamount to public places.  Id.   Steps taken to establish a zone of privacy in an open field may create a subjective expectation of privacy, but it is not an interest recognized by society as protected under the Fourth Amendment.  Oliver, 466 U.S. at 182.

Open fields can be accessed and searched by law enforcement without a warrant, even though the land is secluded, fenced, and posted to keep out trespassers.  Oliver, 466 U.S. at 182.  "The law of trespass recognizes the interest in possession and control of one's property and for that reason permits exclusion of unwanted intruders.  But it does not follow that the right to exclude conferred by trespass law embodies a privacy interest also protected by the

CASE NO.:  1:08cr26-SPM

Fourth Amendment." Id. at 184 n.15.  "[T]respass law extends to instances where the exercise of the right to exclude vindicates no legitimate privacy interest." Id. at 183.

A concept distinct from trespass, the curtilage is not coextensive with property line or the fence line.  Dunn, 480 U.S. at 301.  Instead curtilage is determined by reference to four factors that inform "whether the area in question harbors those intimate activities associated with domestic life and the privacies of the home" such that a person reasonably may expect the area to be treated as an extension of the home. Id. at 301 n.4.  The four factors are:  (1) the proximity of the area to the home, (2) whether the area is within an enclosure surrounding the home, (3) the use of the area, and (4) the steps taken to protect the area from observation by the public. Id. at 301.  Applying these four factors to Defendant's property shows that the officers entered Defendant's curtilage.

First regarding proximity, it is doubtful that the entire three to four acre fenced area around Defendant's home can be deemed curtilage.  The officers, however, walked up the driveway to the area immediately surrounding the house.  Two officers were at Defendant's front door and two others stationed themselves at each side.  They were in a small cleared area within several feet of the house.  This area is close enough to the house to be deemed curtilage.[3]

---

[3] The officers' proximity to the house and the size and layout of the property distinguishes this case from United States v. Lima-Suarez, No.

CASE NO.: 1:08cr26-SPM

Second, the area immediately near Defendant's house is enclosed by heavy natural vegetation and a fence. This area is marked and identifiable. "[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception of defining curtilage–as the area around the home to which the activity of home life extends–is a familiar one understood by daily experience." Dunn, 480 U.S. at 302. The officers went into this area when they stood outside Defendant's front door and at the sides of his house.

Third, the use of the area makes it part and parcel of Defendant's home. Defendant uses the area as the entrance to his house. Unlike many homeowners, Defendant did not leave the entrance open to social and business guests. See United States v. Redmon, 138 F.3d 1109, 1130 (7th Cir. 1998) (Posner, J. dissenting) ("Most homeowners extend an implicit invitation to social and business invitees to walk up to the front door, but in doing so the homeowner does not, as it were 'wave curtilage.'"); Mei Fung So, Search and seizure: reasonable expectation of privacy in driveways, 60 A.L.R. 5th 1 (1998). Instead, Defendant took pains to keep visitors out. He posted two guard dog warning

---

1:05cr40-SPM, Order Denying Motion to Suppress, doc. 213, 2006 WL 763426 (N.D. Fla. Mar. 23, 2006). In the Lima-Suarez case, the officers jumped the fence surrounding an eighty acre parcel of property and walked up a paved driveway toward the house. They did not reach the house, however, and encountered an occupant approximately fifty yards away from the house. Id. at *5. There was no demarcation or boundary that would distinguish the area of encounter from the surrounding open fields.

CASE NO.: 1:08cr26-SPM

signs on the gate.  He kept a phone number on the business sign by the gate so that visitors would call him instead of entering his property without notice.  He kept his mailbox across the street.  Thus, while privacy expectations are generally diminished in common entrances and pathways, 1 W. LaFave, Search and Seizure, § 2.3(c) (4th ed.), Defendant maintained his expectation of privacy by restricting access to this area and providing an alternative means for visitors to contact him.

Finally, Defendant took steps to protect the area from public observation.  Defendant's house sits 100 to 125 feet down the driveway.  Heavy vegetation obscures the view.  With the surrounding fence restricting access, it is difficult to see the house even when standing at the gate.  Although Defendant's house is located in a rural area, it sits off a main road.  The area is not open to casual observation.

Taking all of the factors into consideration, the Court finds that the officers entered Defendant's curtilage when they walked up to his front door and stationed themselves at the sides of his house.  Defendant did not extend an implicit invitation for visitors to enter the area.  He expressed his intent to keep visitors out through warning signs and by locking the gate.  Courts have recognized that "'[o]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may.'"  United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir.

CASE NO.:  1:08cr26-SPM

2006) (citation omitted).  In this case, however, Defendant took pains to exclude visitors by erecting a fence, locking his gate, putting up signs, and enclosing the area with natural vegetation.  The officers did not approach the house in a manner that a private citizen could approach it given the reasonable expectation of privacy that Defendant maintained in the area.  See Madruga v. County of Riverside, 431 F.Supp.2d 1049, 1057 (C.D. Cal. 2005) (explaining why the "knock and talk" exception does not apply to homes made inaccessible to visitors).  The officers' entry into the curtilage violated Defendant's reasonable expectation of privacy under the Fourth Amendment.

**B.    Consent**

Despite the intrusion onto the curtilage, the Government may avoid suppression of the evidence found if it can show that Defendant's subsequent consent to search was voluntary and "'sufficiently an act of free will to purge the primary taint of the unlawful invasion,' or, alternatively, [that] the causal connection had 'become so attenuated as to dissipate the taint.'" United States v. Delancy, 502 F.3d 1297, 1309 (11th Cir. 2007).  The Court must engage in a two-step inquiry to determine first, whether Defendant's consent was voluntary, and second, whether evidence should be excluded as tainted by the unlawful invasion.  Id. at 1308.

    **1.    voluntariness**

It is the Government's burden to show that Defendant's consent to search

was voluntary.  Schneckloth v. Bustamante, 412 U.S. 218, 222 (1973).  The term "voluntary" can be taken expansively to encompass any knowing choice made by a conscious person regardless of coercion or duress.  Id.  On the other extreme, "voluntary" may be taken in the "but for" sense to exclude any choice that has been influenced by official action.  Id. at 224.  For purposes of assessing whether a consent to search is "voluntary," courts must take a sensible approach that acknowledges the "need for police questioning as a tool for the effective enforcement of criminal law" as well as the serious threat to justice posed when "deviations from legal modes of procedure" are tolerated.  Id. at 225, 228.

The inquiry into voluntariness focuses on whether consent to search was obtained by duress or coercion, expressed or implied.  Id. at 228.  "Voluntariness is a question of fact to be determined from all the circumstances . . . ."  Id. 248-49.  The inquiry should take into account the degree of coercion and "the possibly vulnerable state of the person who consents."  Id. at 229.  Although no bright-line rule applies, some factors to consider are whether the defendant was free to leave, the existence of coercive police procedure, the extent of the defendant's cooperation or awareness of a right to refuse consent[4], the ability of the defendant to refuse consent, the extent of the defendant's education and

---

[4] To effectuate a valid consent, it is not required for an individual giving consent to be advised of the right to withhold consent.  Schneckloth, 412 U.S. at 231-33.  Nevertheless, the individual's knowledge of the right to withhold consent is a factor in determining voluntariness.  Id.

CASE NO.: 1:08cr26-SPM

intelligence, and whether the defendant believed that no incriminating evidence would be found.  United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002).  Consideration of these factors shows that Defendant's consent to search was not voluntarily.

First, Defendant was not free to leave at the time he gave his consent to search.  Agent Andrews and Officer Merritt were standing at his front door.  Officers Devinny and Wolfe were positioned nearby at the sides of the house and two other officers were at the gate.  Although Defendant was not handcuffed, under the circumstances he would not have been allowed to leave, nor could he have ordered the officers to leave his premises.

Second, the officers' approach onto his curtilage despite the locked gate was coercive.  Defendant maintained an expectation of privacy in the area surrounding his house.  The officers entered the area anyway.  Moreover, while it is important to distinguish a violation of trespass law[5] from privacy expectations under the Fourth Amendment, from the standpoint of an average homeowner,

---

[5] See Florida Statutes, Sections 810.09 and 810.011.  "A person who, without being authorized, licensed, or invited, willfully enters or remains in any property other than a structure or conveyance . . . [a]s to which notice against entering or remaining is given, either by actual communication to the offender or by posting, fencing, or cultivation as described in s. 810.011 . . . commits the offense of trespass on property other than a structure or conveyance."  Fla. Stat. § 810.09.  "It shall not be necessary to give notice by posting on any enclosed land or place not exceeding 5 acres in area on which there is a dwelling house in order to obtain the benefits of ss. 810.09 and 810.12 pertaining to trespass on enclosed land."  Fla.Stat. § 810.011.

the circumstances of the officers' entry in this case would be intimidating because it resembles a trespass. The invasion onto the property would raise apprehension about lawless activity, which Defendant testified he feared when he was told that the search would be conducted "the easy way or the hard way." Although the officers were courteous to Defendant and kept their side arms holstered, the circumstances of their entry was coercive.

Third, the degree of Defendant's cooperation or awareness of a right to refuse consent, and his ability to refuse consent, indicate that the consent was not voluntary. Within two minutes of answering the door, Defendant gave consent to search and signed a written form that acknowledged:

> 1. I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION TO SEARCH: (Describe the person, places or things to be searched.)
>
>    719 NW CR 235 Newberry, FL
>    the residence & all outbuildings & vehicles
>
> 2. I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY.
>
> 3. I FREELY CONSENT TO THIS SEARCH.

Gov't Ex. 1. An inference can be made based on the language on the form that refusal was an option. Nevertheless, the form does not expressly inform Defendant that he could refuse consent. The form was presented to Defendant soon after he answered the door, and Defendant testified that he did not read the

CASE NO.:  1:08cr26-SPM

form[6] and already felt invaded by the officers' presence.  Defendant remembers Agent Andrews advising him of his options by stating that the search could be conducted "the easy way or the hard way," which Defendant took to be a threat.  Although Defendant talked with a criminal defense attorney over the phone, this happened well after Defendant consented to the search and had shown the officers the marijuana and other items.  Moreover, Defendant was concerned about his son Daryl and wanted to reduce the degree and duration of contact between law enforcement and Daryl.  This concern affected his decision to consent to the search, and undercuts the voluntariness of his consent.

Fourth, there is nothing about Defendant's education and intelligence to indicate that he could not understand that he was being asked for consent to search.  Defendant was, however, surprised to find officers at his door and it was for this reason that the officers made the decision to seek a face to face encounter at the house instead of calling Defendant from his gate.

Finally, there is no indication that Defendant believed officers would not find incriminating evidence.  To the contrary, Defendant showed the officers the twenty-three plants in the barn and the other items in the house.  Thus the facts

---

[6] Defendant also testified that he could not read the writing on the form because he did not have his eyeglasses.  In oral argument, the Government questioned Defendant's credibility on this issue because Defendant also testified that he was able to see six officers from his front door.  Nearsighted and farsighted vision often differs.  This difference is common and does not detract from the credibility of Defendant's testimony.

CASE NO.:  1:08cr26-SPM

of this case do not present a situation where a defendant hides incriminating evidence then voluntarily gives consent because he does not believe the police will find it.

Upon consideration of all the circumstances surrounding Defendant's consent, the Court finds that Defendant's consent was not voluntary. The officers pressured Defendant to cooperate by appearing at his doorstep. The coercive effect of this action was heightened by the fact that Defendant has an autistic son living with him, does not get visitors, and has taken pains to maintain an area of privacy around his house. Defendant was startled by the officers' presence. He testified that he felt invaded and believed that the officers were going to search his house and property no matter what he did. The Court credits Defendant's testimony about his state of mind and finds that his consent for the search was not voluntary.

**2.     taint**

Whether a defendant's consent is free from or tainted by a prior unlawful entry is determined by the totality of the circumstances. Delancy, 502 F.3d at 1309. Three factors are particularly useful in the analysis, and those are: (1) temporal proximity, (2) intervening circumstances, and (3) the "'purpose and flagrancy of the official misconduct.'" Id. (quoting United States v. Santa, 236 F.3d 662, 677 (11th Cir. 2000)).

In this case, the entry and the consent were temporally close.

Defendant's consent to search was given within two minutes of the officers' entry onto his curtilage and knock on his front door.  Second, there were no intervening circumstances to attenuate the affect.  To the contrary, Agent Andrews' presence within the curtilage gave him the ability to smell the marijuana at Defendant's house.  Defendant had been caught by Agent Andrews at his front door and quickly gave his consent.

Finally, while the act of knocking on a citizen's door is not normally an act of police misconduct, it can be improper when the entry is made despite a homeowner's reasonable expectations of privacy.  It is undisputed that the purpose of the entry was to obtain Defendant's consent to search and that a face to face encounter at the door was desired.  The causation in this case between the entry and consent is "so obvious that no real attenuation analysis is even necessary." Delancy, 502 F.3d at 1312.  Entry onto Defendant's curtilage enabled Agent Andrews to smell the marijuana and led to Defendant's concession, cooperation, and consent to search.  There is a direct, unattenuated relationship between the entry and Defendant's consent.

## CONCLUSION

Approaching a house to talk to its occupants can be a legitimate investigative technique.  See Taylor, 458 F.3d at 1204-05.  Courts have recognized that obtaining consent to search may be the only option for gathering evidence when law enforcement officers lack probable cause for a search

warrant.  Schneckloth, 412 U.S. at 227.  Even in situations where probable cause exists, "'[l]aw enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.'" United States v. Tobin, 923 F.2d at 1506, 1511(11th Cir. 1991) (quoting Hoffa v. United States, 385 U.S. 293, 310 (1966)).  Practical reasons may favor a consent search over a warrant search, as a consent search may be more convenient for the subject than a more extensive search conducted with a warrant and not carry the embarrassment or stigma that may arise from a formal process.  Schneckloth, 412 U.S. at 228.

The problem with the "knock and talk" in this case is that Defendant maintained an expectation of privacy recognized under the Fourth Amendment in the curtilage area immediately surrounding his home.  Defendant did not extend an implicit invitation for visitors, including law enforcement, to knock on his door.  To the contrary, he took steps to prevent it and maintain privacy.

When the officers crossed over Defendant's fence and walked to the front and sides of Defendant's house they entered Defendant's curtilage.  The entry was in violation of Defendant's privacy interests protected under the Fourth Amendment.  Defendant's subsequent consent to search was not voluntary.  The consent, moreover, was a direct result of the officers' entry.  Based on the foregoing, it is

CASE NO.:  1:08cr26-SPM

ORDERED AND ADJUDGED:

1. Defendant's Motion to Suppress Evidence (doc. 24) is granted.

2. On or before March 27, 2009, the Government shall advise the Court whether or not it intends to proceed with the April 6, 2009 jury trial.

DONE AND ORDERED this 18th day of March, 2009.

*s/ Stephan P. Mickle*

Stephan P. Mickle
United States District Judge